211 So.2d 903

Lee BURKE and Tom Sanders

v.

Mary THOMAS, as Executrix.

3 Div. 254.

Supreme Court of Alabama.

June 13, 1968.

Gray & Seay, Montgomery, for appellants.

Hill, Robison & Belser, Montgomery, for appellee.

**414**

PER CURIAM.

Jury and verdict, followed by judgment, in the circuit court of Montgomery County, sustaining validity of the last will and testament of Lucy Jackson. Appellants contested the will on the ground of mental incapacity of testatrix to make the will, and on the further ground that the sole beneficiaries of said will, Mary Thomas and Robert Thomas, exerted undue and improper influence on said testatrix that induced her to make the will.

There are thirteen assignments that assert error on the part of the trial court when the contest was tried. Not all of these assignments are insisted on, or are properly argued to invite this court's review. Bates v. Rentz, 262 Ala. 681, 81 So.2d 349(7). We will address our review to those assignments that are properly argued, and will omit consideration of the others.

It appears from the evidence that testatrix was approximately seventy-three years of age and bedridden with paralysis when she signed the will here in question. Her signature was impressed by mark on January 27, 1965, in the presence of Judge D. Eugene Loe and his wife, both of whom signed as witnesses to the instrument.

We will not set forth or summarize all of the testimony of Judge and Mrs. Loe as to the circumstances attending the execution of the will at the home of the testatrix, but will recite some of the salient observations of the witnesses when they testified.

It appears that Judge Loe had known the testatrix over a period of many years prior to the execution of the will. The decedent had been a faithful and acceptable client for many years and had befriended Judge Loe many times. He had drawn a prior will or two for her. She frequently sought his legal advice on business transactions pertinent to her frugal and limited income.

It appears that a few days prior to January 27, 1965, when testatrix signed the will, Judge Loe received a telephonic request to prepare a will for this client. He delayed doing so, but on the date the will was executed, Judge Loe received a telephone call from Mary Thomas, one of the beneficiaries, to prepare a will for his client. Judge Loe elicited from Mary Thomas such information as would enable him to prepare the will in his office, and avoid its prepara-

tion at the home of his client without the aid of a secretary or typewriter. He left blank spaces in the will for insertion of the names of the beneficiaries and of the executrix. These spaces he filled in when he got to the home of his client.

Judge Loe left his wife in the automobile and went into his client's home alone. Mary Thomas was standing in the hallway near the door leading into the room of his client, who was in bed and physically handicapped with a stroke of paralysis. He ascertained from his client the name of the person to be nominated as executrix. The beneficiaries were to be Mary Thomas and Robert Thomas, with the former to be nominated as executrix. These names were inserted in the will (in the handwriting of Judge Loe) at the proper places.

There was no person present in the house who was eligible to witness the will, other than Judge Loe. Rather than wait thirty minutes for a witness to reach the residence, Judge Loe invited his wife to come in and sign as a witness. Both Judge Loe and his wife were present when testatrix signed the will by mark. Her hand was too feeble to write her signature.

We are impressed from the testimony of Judge and Mrs. Loe that, in their judgment, the testatrix appeared fully competent mentally to appreciate and understand the contents of the will which Judge Loe read to her and made pertinent explanations of the provisions thereof.

On direct examination, Judge Loe testified:

"Q. And could you tell the jury when it (the will) was filed for probate, Sir?

"A. On the 16th day of March, 1965. I might say in addition to your question, that Lucy was over twenty-one years of age and of sound mind in my opinion at the time she executed the will, and the will was executed in the presence of Mrs. Loe and myself and in the presence of Lucy Jackson, each at the same time.

"Q. Judge, could you tell us whether or not Lucy was able to talk and converse with you at the time she executed the will?

"A. Yes.

"Q. Did she appear to be mentally alert?

"A. Yes, of course, she had a stroke. In other words, that was the purpose that I went out there, the will was executed at her house, and I went out for the purpose of, that was my purpose in going there.

"Q. But at the time she signed the will, you noted no abnormal defection in her mind or her ability to talk?

"A. No, none other than the fact she, of course, had had the stroke, it was just a known fact that she had a stroke and she was unable to actually sign her name to the will. In other words, she, her stroke had affected her in a way it would have been practically impossible for her to have written her name on out, as she had been able to do in the past, and for that reason I did let her make a cross-mark.

\* \* \* \* \* \*

"Q. Did she appear frightened or coerced at the time she executed the will?

"A. No. If you wish me to, I will tell you what took place when I went there.

"Q. If you could, please.

"A. It happened that I had been called several times, a couple of times at least, to, Lucy wanted me to come out and change her will. And actually I had represented Lucy over a period of time, well, and she was one of my faithful colored friends, in other words, over all the years that I had been practicing, probably, at least many, many years, and I felt that it was my duty to go out if she really wanted to change her will. And I did get information from the party who called me (Mary Thomas), \* \* \* the woman sitting there at the table, as to what she

proposed to put in her will. This will, this will, was typed, written up at my office, with the blanks, in order that I wouldn't have to write it out in longhand as some of the lawyers have to do, provided that was what she really wished. When I first got there, the front door was open, some children were in the hall, and I just walked on in. I asked where Lucy's room was, and I was directed to Lucy's room, and she was in bed in her room. I went in there and talked with her for some few minutes. I asked if she knew why I was out there, in effect, of course, without remembering the exact details on each, and she told me she sent for me to change her will, in fact, I actually also knew Lee Burke had been in the office with her on occasion himself, and—

"Q. (Interrupting) And Lee Burke is the contestant, is that right?

"A. One of them, yes. And I asked her why she wanted it changed and so forth, and she explained to me that her reason for change was they wanted to put her in a nursing home and she didn't want to go to a nursing home, and that this woman was looking after her, taking care of her, and that she wanted it changed so that she could be the beneficiary along with this other beneficiary. And it clearly appeared to me that Lucy was of lucid mind and knew what she was doing and she had capacity to make a will even though she was under this incapacity of a stroke. * * *"

Mrs. Loe, testifying prior to her husband, stated as follows:

"Q. Now, at the time Judge Loe read this will to Lucy, both you and Lucy and Judge were in the room together?

"A. Yes.

"Q. Was there anyone else in the room?

"A. Mary was standing in the door.

"Q. There was no one else in the room that you recall?

"A. No, no, not that I recall.

"Q. Now, when Judge read the will and asked her if that's what she wanted to do, you said she stated it was?

"A. That's right.

"Q. Was she able to talk?

"A. Oh, yes.

"Q. Did you have any conversation with her?

"A. No, when I went in, when Judge Loe came out to the car and got me and said that he wanted me to come in and witness the will, he said, 'Lucy, this is Mrs. Loe,' and she said, 'I have seen Mrs. Loe down at your office,' and that's the only conversation.

"Q. That's the only conversation?

"A. That's the only conversation. I didn't enter into that.

"Q. Well, she was clear in her talk, is that right?

"A. Oh, yes, she was clear."

Mary Thomas, one of the beneficiaries and executrix, testified as to her presence in the home of testatrix when the will was signed, when she came, and the circumstances leading to her arrival on January 24, 1965. It appears that she came there to take care of testatrix during her illness; and that testatrix did not want to go to a nursing home, but wanted to remain in her own home. That none of her relatives was looking after her—Mary Thomas was perhaps distantly related to testatrix and had known her since she, Mary Thomas, was a child. It further appears that testatrix wanted to compensate Mary by making her a beneficiary of her will. It further appears that testatrix owned about 33 acres of land that she inherited, and a cow or two when Mary arrived. The State Welfare Department began providing $100 per month for the maintenance of the patient and Mary Thomas. The decedent was also drawing $40 a month social security. Mary Thomas testified:

"Q. Do you recall when Judge Loe and Mrs. Loe came out to Lucy's house?

"A. Well, she, I didn't know her lawyer. I had heard no talk of him. She, she was talking about a will, she said, she used to tell my mother all the time, if she always wanted me to live with her, but I didn't, and she always said if I come and take care of her, she wanted me to have everything she had. And so I went down, I stayed there awhile, and she started talkin', you know, about the will, and she wanted me to call Judge Loe, and so I called him."

On cross-examination the witness testified:

"Q. Tell me exactly what she said the first time that she said anything about it?

"A. She said 'May', she called me 'May', she said 'you come down to take care of me,' said 'Lee wants to put me in a home and I don't want to go, and after you and Robert come take care of me, I want you and him to have what I have.' "

■ As we view the above evidence, testatrix, during her illness, was quite anxious for Mary Thomas to come and look after her. She was helpless, bedridden, and alone. The small income she had was inadequate to hire an attendant. Therefore, she was quite anxious for Mary Thomas to live with her, and look after her during her illness. According to our view of the evidence, which we have carefully considered, we do not think that Mary Thomas was guilty of any coercion or activities that unduly influenced or persuaded Lucy Jackson to make the will. We do not think that the mere telephone call of Mary Thomas to Judge Loe made at the request of testatrix, was undue activity on her part. The call, disassociated from any other activity, was an isolated incident that could not be classified as activity.

■■ There was considerable testimony offered by contestants of the will relating to the mental and physical condition of testatrix before and after she was stricken with paralysis, but there was no direct evidence other than that of Judge Loe and his wife as to her mental condition at the time she signed the will. The evidence offered by contestants that testatrix was in poor physical and mental condition prior to January 27, 1965, shed light on her physical and mental condition when the will was signed. It tended to refute the evidence of Judge Loe and his wife. Likewise, evidence as to her mental and physical condition immediately following January 27, 1965, when the will was signed, also was admissible as tending to shed light on testatrix's condition when the will was signed. The pivotal question for the jury was testatrix's mental condition or mental capacity at the time of the execution of the will. Price v. Marshall, 255 Ala. 447, 52 So.2d 149(4).

■■ Appellants (contestants) first argue assignment of error No. 3, which asserts that the verdict and judgment were based upon insufficient evidence. There is no such ground included in the motion for the new trial that was overruled. In the absence of a ruling on the ground that the evidence was insufficient, we cannot consider this assignment. An assignment of error which fails to refer to any ruling of the trial court presents nothing for review. Cash v. Usrey, 278 Ala. 313, 178 So.2d 91(2).

The next contention is that the trial court erred in overruling appellants' motion for a new trial. The motion contains 18 different grounds. Appellants' brief states: "The foregoing argument, advanced in support of assignment of error No. 3, is equally applicable to assignment of error No. 1." They then adopt argument advanced in support of assignment of error No. 3. All that assignment of error No. 1 says, is that the Court erred in denying appellants' motion for a new trial. No specific reference is made to any ground of the motion. They fail to specify which ground or grounds they had in mind. We will not cast about among the several grounds of the motion to find out

which ground appellants contend their argument in assignment of error No. 3 is applicable. No specific reference is made in the brief and argument.

Appellants adopt the argument advanced in support of assignment of error No. 3, as applicable to assignment of error No. 2. The latter assignment asserts that the verdict of the jury and the judgment thereon were against the weight of the evidence. Again, we find that the ground asserted in assignment of error No. 2 was not incorporated in the motion for a new trial. The assignment is not referable to any ruling of the trial court. Hence, we cannot consider the same. Cash v. Usrey, supra.

We find that appellants adopt the argument advanced in support of assignment of error No. 3 and make the same applicable to assignment of error No. 4, which says that the verdict and judgment were contrary to the evidence. We do not find this ground incorporated in the motion for a new trial. The assignment is not referable to any ruling of the trial court, and our rule in Cash v. Usrey, supra, applies.

We might add, parenthetically, that we think the verdict of the jury was not against the weight of the evidence, nor contrary to the same. The evidence was sufficient to sustain the verdict and the judgment.

We next come to assignments of error Nos. 5, 6 and 7 relative to the court's action in sustaining appellee's objection to different questions propounded to three separate witnesses.

■ Assignment of error No. 5 relates to the sustaining by the trial court of the objections of appellee to appellants' question propounded to contestants' witness, Tom Sanders. The question was: "Did you and Lucy ever talk about, during her life, did you ever discuss with her what she was going to do with her property in the event of her death?"

We think the question was too broad and unrestricted as to time. Tom Sanders was testatrix's twin brother, and 73 years of age.

"* * * To be admissible, the statements or declarations (of a testatrix) *must not have been made at a period too remote from the time when the will was executed*; they are admissible on the issue of testamentary capacity only where they are made so near to the execution of the will as to afford a reasonable inference of the condition of his mind at that time. Whether evidence of prior testamentary intentions is too remote to be admissible on the issue of testamentary capacity or undue influence depends on the circumstances of each case, *and the determination of the trial judge is practically final*." [Emphasis supplied.] 57 Am.Jur., Wills, § 124, p. 118. See, also 79 A.L.R. Anno., 1449, where it is commented:

"The general rule established by the overwhelming weight of authority is that declarations of the testator not made contemporaneously with the execution of the will, or so near thereto as to constitute a part of the res gestae, are not competent as direct or substantive evidence of the truth of the matters therein stated, when offered on the issue of undue influence inducing the execution of the will (citing Coghill v. Kennedy, (1898) 119 Ala. 641, 24 So. 459(20, 21). If offered as direct or substantive evidence of an external fact, such as undue influence or fraud, statements of a testator are merely hearsay, and are liable to all the objections to which mere declarations of third parties are subject. * * * *"

There was no error in sustaining the objection to the question.

■ What we have said with reference to assignment of error No. 5, supra, applies to assignment of error No. 6, which refers to action of the trial court in sustaining appellee's objection propounded on direct examination to witness, Jean Williams, as to whether testatrix had indicated during her lifetime what disposition she wanted made of her property.

The same principle of law applicable to assignments of error Nos. 5 and 6, supra, has application to the trial court's action in sustaining appellee's objection to direct examination of the witness, Edward Adams, as to whether testatrix had indicated during her lifetime what disposition she wanted made of her property.

Assignment of error No. 8 asserts error on the action of the trial court in sustaining proponent's objection to a question propounded by contestants on direct examination to their witness, Sarah Stuckey. The question is: "In your opinion, was Miss Jackson at that time (February 3, 1965) capable of managing and conducting her own affairs?" This question came after the following question and answer:

"Q. Was she able to communicate with you?

"A. Since I knew her since '61, and knew her to be a very intelligent, sharp, crafty woman, who was able to establish her own eligibility with social security office, I could scarcely believe the change that had come over her, because she was so limited, she wasn't able to see, she had a vision and she indicated that she could see, but her communication with me was very poor, and I had to obtain most of my information from our files and from Mary Thomas, who was present.

"Q. And this was on February 3rd?

"A. Right."

When the question, "In your opinion, was Miss Jackson at that time capable of managing and conducting her own affairs?" was propounded, there was no evidence as to when and how often the witness had seen the decedent. Evidence was brought out on cross-examination that the witness had interviews with testatrix on October 28, 1963, September 14, 1964, and February 3, 1965. This evidence was brought out after the court had sustained the objection to the question.

The question sought the witness' non-expert opinion as to the capability of the testatrix in managing and conducting her own affairs on February 3, 1965, when the witness saw the testatrix.

■ We think the court with propriety could have permitted an answer, and it would have had a minuscule bearing on the mental condition of the testatrix when she signed the will on January 27, 1965. But, in view of the fact that the witness had just testified about the change that had come over her, and her limited condition, we think the exclusion of the witness' opinion as to the testatrix's capability in managing her own affairs on February 3, 1965, was error without injury. It was possible, indeed probable, that a marked change in testatrix's mental condition could have taken place between January 27, 1965, when she signed the will, and February 3, 1965, when the witness saw testatrix. We are unwilling to reverse the trial court in sustaining the objection.

■ Appellants complain in assignment of error No. 11 that the trial court erred in refusing to read their written charge No. 15 to the jury, which is as follows:

"CONTESTANTS' CHARGE NO. 15. The Court charges the jury that, if they are reasonably satisfied of the existence of confidential relations between the testatrix and MARY THOMAS with an activity on the part of the said MARY THOMAS in and about the execution and preparation of said Will, such as the initiation of proceedings for the preparation of the Will, or participation in such preparation, employing the draftsman, selecting the witnesses, excluding persons from the testatrix at or about the time of the execution of the Will, concealing the making of the Will after it was made, and the like—these facts, if proven to the reasonably satisfaction of the jury, will raise a presumption of undue influence, and cast on the said MARY THOMAS the burden of showing that the Will was not induced by coercion or fraud on her part, directly or indirectly."

We think the charge was properly refused. Some of the factual allegations delineated in the charge do not comport with the evidence. No witness testified, and no inference could be logically drawn from the evidence, that Mary Thomas selected any witnesses or excluded persons from testatrix at or about the time testatrix executed the will. There is no evidence that she concealed the will after it was made. The charge would have had a tendency to emphasize a situation that is not mentioned in the evidence. There is no evidence that Mary Thomas employed the attorney who drafted the will. She requested the attorney to render the service, but the request was at the instruction of testatrix.

 Refusal of a written charge is proper, when it is abstract and misleading, when not all the facts hypothesized in the charge could be inferred from the facts proven. Park v. Whitfield, 210 Ala. 18, 97 So. 68(12); Shelton v. Gordon, 252, 187, 40 So.2d 95(7).

Assignments of error Nos. 9, 10 and 13 charge error on the part of the court in refusing contestants' written charges Nos. 1, 7 and 20 respectively, which are as follows:

"CONTESTANTS' CHARGE NO. 1. I charge you gentlemen of the jury that the existence of confidential relations, if you are reasonably satisfied from the evidence that such relations existed, between the testatrix and the beneficiaries under the will, excites the suspicion and jealousy of the Court, and casts upon the proponent of the will the duty of showing, by affirmative evidence, the testatrix's capacity, volition and free agency."

"CONTESTANTS' CHARGE NO. 7. If the jury is reasonably satisfied from the evidence, that the deceased was, at the time of the execution of said alleged will, an aged woman, and had a weak mind and memory, although she might not be legally incompetent to make a will, yet the will of such a person ought not to be sustained, unless it appeared that such disposition of property had been fairly made and emanated from a free will without the interposition of others."

"CONTESTANTS' CHARGE NO. 20. You are instructed that the general rule of law in a contest of a Will for undue influence is that the burden of proof is put upon the contestants; that is, the proof of the legal execution of a Will having been made by a testatrix of sound mind at the time of its execution, and who is otherwise legally qualified to make a Will, puts on the contestants the duty of showing that the Will was the result of undue influence exerted upon the testatrix. To this general rule, however, there are exceptions. Where one alleged to have used undue influence, previously defined, stands in some confidential relation towards the testatrix, and receives large benefits under the Will, then the burden of proof shifts from the party seeking to defeat, to the party seeking to establish, the Will, and [the] latter must satisfy the jury that the Will was the free act of the testatrix. If, from the evidence, you believe the proponents possessed great influence over LUCY JACKSON and by that influence procured the making of the Will in question, and that the proponents stood in a confidential relation to LUCY JACKSON, and received large benefits under this Will, to the exclusion of those naturally entitled to her bounty, you will find this Will void for undue influence."

 Appellants cite the case of Moore v. Spier, 80 Ala. 129. This case was specifically overruled in Bancroft v. Otis, 91 Ala. 279, 8 So. 286, 24 Am.St.Rep. 904. Our cases, starting with the *Bancroft* decision, have enunciated the doctrine that no manner or degree of confidential relationship, of and by itself, will suffice to cast on the beneficiary in a will the burden of proving that the testamentary act was not unduly influenced by him. The fact that one is a favored beneficiary, and in a confidential relationship with testator, does not alone

raise a presumption that the will was procured by undue influence. Kahalley v. Kahalley, 248 Ala. 624, 28 So.2d 792; Lockridge v. Brown, 184 Ala. 106, 63 So. 524; 66 A.L.R., Anno., 228. There must be evidence, in addition to the fact of relationship, of active interference in procuring the execution of the will. Lockridge v. Brown, supra (5); Coghill v. Kennedy, 119 Ala. 641, 24 So. 459(5). The activity must be in procuring the execution of the will and more than an activity and interest referable solely to a compliance with or obedience to the voluntary and untrammeled directions of the testator. Kahalley v. Kahalley, supra (4), and cases cited.

 Each of the refused charges Nos. 1 and 20 hypothesized on confidential relationship and omits any reference to requisite factual activities on the part of the beneficiary. The refusal of these charges was free of error.

 Refused charge No. 7 employs the words "without the interposition of others." It was taken verbatim from the overruled case of Moore v. Spier, supra. The effect of the charge was to instruct the jury that although Mary Jackson might not have been legally incompetent to make her will, although an aged woman with a weak mind and memory, yet her will ought not to be sustained unless it appeared that such disposition of her property had been fairly made and emanated from a free will without interposition of others.

The words "without interposition of others" fails to declare the character of interposition, or give the jury any light as to the nature of the interposition that would affect the disposition. The charge is misleading and confusing in the light of the pronouncements of this court when it overruled Moore v. Spier, supra. We will not charge the court with error in its refusal to give the charge.

The judgment of the trial court is affirmed.

The foregoing opinion was prepared by B. W. Simmons, Supernumerary Circuit Judge, and was adopted by the court as its opinion.

Affirmed.

LIVINGSTON, C. J., and SIMPSON, COLEMAN and KOHN, JJ., concur.