This is an appeal from a judgment entered on a jury verdict in favor of the proponent of a will. We affirm.
The proponent, Neva Donaldson, offered for probate the purported will of her deceased aunt, Minnie Cook. This will named the proponent as both sole beneficiary and executrix. A contest was filed by Minnie Cook's surviving sister and various nieces and nephews. Revocation and undue influence were alleged as grounds for the contest.
The record indicates that the testatrix, Minnie Cook, executed duplicate originals of a will on October 22, 1973. The evidence on behalf of the proponent, Neva Donaldson, consisted solely of her testimony. According to the proponent, Minnie requested that she take her "to town to tend to some business." Mrs. Donaldson drove to Enterprise, where Minnie directed her to an attorney's office. Minnie told the attorney that she wanted to leave the proponent "everything I've got." Duplicate originals of the will were then executed with attorneys Warren Rowe and B.B. Rowe and their secretary, Deborah Woodham, as witnesses.
Mrs. Donaldson testified that when they returned to Minnie's house, she was directed to place one copy of the will underneath the television set in the living room. Minnie then gave her the other copy to keep "in cases [sic] if my house gets burned up or this gets misplaced." Although Minnie once took her copy of the will to the proponent's home in Panama City, Florida, and inadvertently left it there, Mrs. Donaldson testified that she returned it, and, in 1980, again saw it at Minnie's house. At that time, the proponent had "heard" that Minnie had made a will in favor of another *Page 32 
niece and questioned Minnie concerning that. According to Mrs. Donaldson, Minnie assured her that "she hadn't never [sic] made but one will" and that she "wasn't going to make nary another will because it cost too much." Later, on December 26, 1981, the proponent was visiting Minnie, when Minnie asked, "[Y]ou know where I keep my will?" The proponent answered that she did. Minnie said, "[W]ell, I ain't changed nothing."
After Minnie's death on January 21, 1982, the proponent attempted to locate Minnie's copy of the will. She asked Leida Warren, a former sister-in-law of Minnie's and the mother of two of the contestants, for the key to Minnie's house, but Mrs. Warren refused to give it to her. When the proponent informed Mrs. Warren that she had a will, Mrs. Warren responded "you'll damn sure pay hell proving it."
Mrs. Donaldson testified that around the first of February, she went to Minnie's house and "went through the window." She found the house in disarray, with most of the furniture missing. The mattress and a cushion had been ripped open and clothes were "pulled out . . . on the floor." In the living room, she said, "there was paper all over there and in this corner where we had the deeds, the will, pardon me, the will, this TV that was on rollers, it had been pushed back, ripped out in back. The carpet was turned up, the throw rug in front of the TV was way in the kitchen."
The contestants offered the evidence of two of Minnie's neighbors. Both testified that Minnie had told them that she had destroyed her will. One neighbor, Maiva White, further related that Minnie "said she wasn't going to make no will. Said her people wouldn't come and do nothing for her and see about her and if they got what she had she was going to let them get it the hard way." The following exchange also occurred during her testimony:
 "Q. [By contestants' attorney] Did [the proponent] come around very much?
"A. I didn't ever see her.
 "Q. I see. Now, did Mrs. Cook ever tell you anything about her will?
 "A. Not really. She just told me she had some fixed.
 "Q. I see. Did she ever tell you about who she was going to leave things to?
"A. Huh-uh.
 "Q. All right. Did she ever tell you about having made a will to somebody?
 "A. Yeah, she told me she made several wills over the years.
"Q. What did she say she did with them?
"A. Said she burned all that she had made.
 "Q. Do you know about her going down to [the proponent's home] back in '73 a few times?
"A. Yeah, she told me she went down there.
 "Q. Did she have any understanding with [the proponent] — did she make any agreement with [the proponent] about a will?
 "A. She didn't say it in that words. She just said she wanted to give her — what she had — to somebody to take care of her.
"Q. Uh-huh.
 "A. And so she turned all of her important papers and things over to [the proponent]. And she was supposed to take care of her. And she went down there and stayed a while and I don't know what went wrong and she told me that she got all of her papers and things back and when she got those back she just burned all those wills she ever made."
Leida Warren, who was the mother of two contestants and who had herself been a contestant until dismissed due to the fact that she was not an heir at law, also testified on behalf of the contestants. She stated that, in 1974, Minnie showed her the will in which Minnie left everything to the proponent. According to Mrs. Warren, she was "taking care of [Minnie's] business for her" prior to her death. She related that at some point she had asked Minnie, "[D]on't you know I'm tired of working for you and *Page 33 
you got your will made for somebody else? And [Minnie] said I done burned that thing up." Mrs. Warren testified that sometime later Minnie offered to make a will in her favor, but that she "didn't let her."
Mrs. Warren also testified that she had the key to Minnie's house when Minnie died. After Minnie's death, Mrs. Warren went to the house with one of Minnie's nephews and his wife and they searched through Minnie's papers. She stated that she found "old letters, old deeds, mortgages and bills of all kinds," which she turned over to an attorney. She said that she did not, however, find a will, although she did find two empty will covers.
In Summerhill v. Craft, 425 So.2d 1055, 1057 (Ala. 1982), this Court stated: "If a testatrix keeps one of two duplicate original wills and gives the other to another person, and no will is found in her possession at her death, `the presumption arises that [s]he destroyed it for the purpose of revocation.'Stiles v. Brown, 380 So.2d 792, 796 (Ala. 1980)." While this presumption is rebuttable, the burden of rebutting the presumption rests with the proponent of the will. Stiles, 380 So.2d at 795; Barksdale v. Pendergrass, 294 Ala. 526,319 So.2d 267 (1975).
Evidence offered by the proponent which merely shows "that a will contestant had access to the will after the testatrix's death is not enough to overcome the presumption [of revocation]." Summerhill, 425 So.2d at 1057. In Lovell v.Lovell, 272 Ala. 409, 412, 132 So.2d 382, 384 (1961), it was held that the presumption was not overcome by evidence showing that a contestant not only had opportunity to destroy the will, but also told the proponent, who had a copy of the will, "that she would have `to find the original will and it has got to be signed and the date has got to be right.'" Here, however, the proponent's testimony, taken as a whole, tends to show much more than the evidence in Lovell. Her account of the disordered condition of the house and her testimony that Minnie had several times reaffirmed the existence of the will, the last time being less than a month before her death, are factors to be considered. Cf. Stiles, supra (presumption rebutted by fact that attorney told testator he must, to revoke the will, destroy both the copy retained by the attorney and the copy taken by the testator, and with the fact that the testator never attempted to destroy the copy retained by the attorney, coupled with the fact that a contestant had access to the will after the testator's death.)
Where, as here, the proponent's evidence is contradicted by evidence presented by the contestants, this Court cannot find that as a matter of law the proponent has "over[come] the presumption of revocation raised by the failure to find [the testatrix's] copy of the will." Summerhill, 425 So.2d at 1057. However, a jury question on this issue was clearly presented,see Summerhill, supra, and the proponent's testimony, if believed, was sufficient to support the verdict. Cf. New YorkLife Ins. Co. v. Turner, 213 Ala. 286, 288, 104 So. 643, 644
(1925) ("When a presumption [in a civil case] is to be overcome, the jury, giving due weight to the presumption in the light of judgment and experience, and in connection with the whole evidence, must be reasonably satisfied.").
It is well established that the contestant who challenges a will on the basis of undue influence bears the burden of proving such allegation. Sanford v. Coleman, 418 So.2d 856, 858
(Ala. 1982); Clark v. Clark, 280 Ala. 644, 649, 197 So.2d 447,451 (1967). To meet this burden, and thereby raise a presumption of undue influence, the contestant must establish:
 "(a) The existence of a dominant, confidential relationship between a favored beneficiary and the testator; and
 "(b) active interference or undue activity by the beneficiary in procuring the execution of the will." (Emphasis added.) Price v. Norris, 428 So.2d 609, 610
(Ala. 1983).
The contestants in the present case have failed to establish either element. While there was some evidence that the *Page 34 
proponent was supposed to be "taking care of the testatrix," this alone will not establish the necessary confidential relationship, nor does it show any undue activity on the part of the proponent. See Burke v. Thomas, 282 Ala. 412,211 So.2d 903 (1968).
The proponent's testimony tended to show that she had a close and affectionate relationship with the testatrix Minnie Cook, but even that evidence does not establish the required "dominant, confidential relationship." Moreover, even if we assume that a confidential relationship existed between the proponent and Minnie, we cannot say that there was any active interference or undue activity on the part of the proponent. "Undue activity" must be "more than an activity and interest referable solely to a compliance with or obedience to the voluntary and untrammeled directions of the testa[trix]." Burkev. Thomas, 282 Ala. at 421, 211 So.2d at 912 (1968). The mere fact that the proponent transported Minnie, at her request, to Enterprise "to seek a lawyer to draw the will, does not within itself establish such undue activity on the part of [the proponent]." Johnson v. Howard, 279 Ala. 16, 21, 181 So.2d 85,90 (1965).
The contestants also assert that the trial court erred in giving the following charge requested by the proponent:
 "The fact that the will left in the testator's possession cannot be found after his death creates a presumption that the will was destroyed by the testator animo revocandi, or with intent to revoke. The presumption referred to is not an irrebuttable conclusion of law; it is a mere inference of fact."
The charge, taken directly from this Court's opinion in Stilesv. Brown, 380 So.2d 792, 795 (Ala. 1980), is a correct statement of law and is applicable to the instant facts.
Let the judgment be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.