BEATTY, Justice.
This is an appeal by the contestants of a will from orders denying their motions for directed verdict, judgment notwithstanding the verdict, and new trial. We affirm.
The contestants are Jerome B. Weinberg, Nettie Sue Almanda, and Martha Crump. The proponent is David R. Weinberg. All are children of the testator, Ruby Weinberg, who died on September 6, 1984.
The will in question was executed by the testatrix on February 16,1978. In the will, the testatrix purported to devise her estate to the children named above in equal shares. The will also nominated David R. Weinberg as executor without bond or sureties. It is this latter proviso that made this will different from a prior will made by the testatrix and that generated this contest. In the probate proceeding below, the contestants challenged the 1978 will as having been procured through the undue influence of David R. Weinberg, and claimed, in the alternative, that Ruby Weinberg, the testatrix, was of unsound mind at the time the 1978 will was executed.
The petition for probate, with a copy of the purported will attached, was filed by David R. Weinberg. This was followed by the petition for contest, which was accompanied by the contestants’ motion for appointment of a special administrator ad colligendum; see Code of 1975, § 43-2-47. The proponent filed a like motion for appointment of himself; however, the probate court appointed an independent person as special administrator, and letters of administration ad colligendum were subsequently granted to that person.
After the proponent had answered the contest petition with a denial of undue influence and unsound mind, the contestants moved for summary judgment, their motion being supported by affidavits and exhibits. The motion was denied, and the case proceeded to trial to a jury, which, in *1137 due course, returned a verdict in favor of the 1978 will. This appeal followed.
The contestants insist that the court below erred in refusing their trial and post-trial motions, because, they say, the proponent offered no evidence rebutting their prima facie case, thus failing to carry his burden of proof, and because the verdict was against the great weight of the evidence.
At trial, the proponent called as his first witness a practicing attorney who had witnessed the will. Although this witness acknowledged having no independent recollection of having witnessed the will, he did testify to the practice he followed in witnessing wills prepared by other lawyers:
“It was my policy to listen to the person executing the will talk and sometimes carry on a conversation, and sometimes not, to make a determination whether the person in my judgment, number one, was of mature age, that is over the age of twenty-one or nineteen, and second, whether the person was of sound mind and disposing memory, those being the pivotal legal criteria, and thirdly, that this person did present to me a document that he or she wanted to execute in my presence as a witness as his or her last will and testament. I would listen to the person say, ‘yes, I want you to witness this’ or, ‘yes, this is my last will and testament.’ I form those conclusions and those opinions, and if — I guess I would have to say that if, in my judgment, the person was over nineteen or twenty-one years of age, whichever was the legal age at that time, of sound mind and disposing memory, did present this and did understand this to be their last will and testament, then I would proceed to execute this as a witness. Now, if I had prepared the will, I would have already been in conversation with them, and I would have already known these things.
“Q. You didn’t prepare this?
“A. No.
[[Image here]]
“Q. Notwithstanding the fact that you have no independent recollection, that is, you have no picture of that having been done, does the fact that you see your signature on that instrument, and having gone through what you do on all such occasions, make you come to the conclusion that you came to a conclusion concerning that person’s mental status?
“A. Yes.
[[Image here]]
“A. I am fairly certain, just what I see before me, that Ronald Stichweh prepared the will, and I am certain that I witnessed this document as her [Mrs. Weinberg’s] last will and testament. I see my signature and my initials. Having before me all this information, I am of the opinion that at the time I witnessed it, she [Mrs. Weinberg] was, in my judgment, of sound mind and disposing memory, over the age of twenty-one years, and did know that she was presenting this as her last will and testament.
“Q. As her will?
“A. Yes.”
Mr. Ronald Stichweh, the lawyer who prepared the 1978 will, testified that Mrs. Weinberg came to his office on February 9, 1978, in the company of her son, David R. Weinberg. Mr. Stichweh talked with both of them, and, he testified, during that conversation, Mrs. Weinberg told him “what she wanted in the will.” He made an appointment with her to return on February 16 to execute the will. Additional testimony was elicited:
“Q. Now do you, as a lawyer, do you come to any conclusions in your own mind, having talked to your client, say, on the two occasions, as to her mental condition as it pertains to wills?
“A. Yes, sir. You have to.
“Q. And what was your judgment on February the ninth and February the sixteenth concerning Ms. Weinberg’s mental condition?
“A. That she had the requisite capacity to execute a will.
“Q. And in her conversation with you, did she make sense in her talking?
“A. Yes, sir.
*1138 “Q. You could understand what she said?
“A. Yes, sir.
“Q. And did you come to other conclusions as to whether it was her own free will in making the will?
“A. Are you asking me if I came to that conclusion?
“Q. Yes, sir.
“A. Yes, sir.
“Q. And what was that?
“A. That this was what she wanted in her will that I had prepared for her.”
Mr. Stichweh said he observed that no one in his presence coerced Mrs. Weinberg “in any fashion in order to get her to execute the will”:
“Q. And when you talked to her and she talked to you, did she give the appearance of talking freely?
“A. Yes, sir.”
Mr. Stichweh conceded on cross-examination his difficulty in recalling the details of his discussion with Mrs. Weinberg and her son:
“Q. In answer to Mr. McDonald’s questions that dealt with your remembering the details of what you had discussed with Ms. Weinberg and Bobby [David R.] on that date, do I take it you are really saying that you don’t recall the details, but those are the normal things you would have done since you have made a number of wills for people, and those are the type things you normally do when other people come to you for wills; is that correct?
“A. That is correct.”
Mr. Stichweh’s testimony was followed by that of Ms. Joan Copp, a branch manager of Jefferson Federal Savings and Loan Association. Ms. Copp’s testimony established her familiarity with Mrs. Weinberg through the latter’s seven or eight visits between 1976 and 1978 to the branch to transact business. Ms. Copp stated that on those occasions Mrs. Weinberg seemed to handle “those money affairs fairly for herself,” appeared to be of sound mind, was agreeable and friendly, and spoke nicely. She added that on those occasions Mrs. Weinberg was accompanied by David Weinberg and was either making a simple deposit or a simple withdrawal.
Following the conclusion of this testimony, the proponent rested. At that time, the court held that the burden of proof had shifted to the contestants, who then moved to deny probate on the ground that the proponent’s evidence was insufficient to establish mental competency. It should be noted here that, in the posture of this case, once the proponent established a prima facie case as to the validity of the will, the burden of proof shifted to the contestants to offer proof of undue influence and mental incapacity, which were the grounds of challenge. Anderton v. Latham, 342 So.2d 779 (Ala.1977). See also Ray v. McClelland, 274 Ala. 363, 148 So.2d 221 (1962).
Jerome Weinberg, one of the testator’s children and one of the contestants, testified at length. He related that his father had left an estate of $149,992 to his widow, the instant testatrix. He established that his brother David had continued to live at home with his mother and that David took complete charge of the management of his mother’s assets and business affairs. The children met together in 1974 to discuss a report prepared by David on the estate’s status, and a consensus was reached to maintain the estate in liquid assets.
The children met again at the end of 1975 to discuss David’s status report for that year. It was then revealed that David had used the estate’s money to purchase five single-family houses in his own name. David acknowledged at the meeting that these properties were his mother’s. According to Jerome, it was agreed that David would cease buying houses and would attempt to sell at a profit the houses he had purchased.
While discussing the 1976 report, however, it was disclosed that David had purchased additional houses, which were being mortgaged, with one of these houses having been purchased by using his mother’s common stock as collateral.
And at a meeting in early 1978 to consider David’s 1977 report, the contestant chil *1139 dren discovered that, as of January 15, 1978, David had purchased seven additional houses in his own name with estate funds, and that he had incurred a debt of $184,801 for the estate. This action led to written recommendations by the contestant children to David regarding the handling of the estate, which recommendations David later refused. Meanwhile, David and his mother visited Mr. Stichweh’s office, where Mrs. Weinberg’s will was discussed and later executed.
A short time later, the contestant children consulted another lawyer concerning the establishment of a trust for Mrs. Weinberg. This was, accordingly, accomplished, with Mrs. Weinberg, as grantor, conveying all of her assets to Martha, Nettie Sue, and Jerome as the trustees. Mrs. Weinberg revoked a power of attorney previously given to David. The trustees’ efforts to identify and take charge of the trust assets resulted in litigation. Many exhibits were received in that litigation, including various documents in the handwriting of both David and his mother, some implying that David had written drafts of letters and other statements that were adopted by his mother in her own writings. One of these documents was a letter from Mrs. Weinberg to the lawyer who had prepared the trust instrument, requesting that the trust be terminated and that David be allowed to continue to run her business. Another exhibit disclosed a second letter to that lawyer and the trustees stating that she did not receive the $5 denoted as consideration for the trust conveyance, that she did not know what she signed, and that she was “happy with the way Bobby [David] manages my money.” Drafts of proposed agreements between David and his mother authorizing David’s exclusive control over her business operations and her property were also disclosed.
Having found the documents in question, the contestant children decided among themselves that their mother had not been competent at the time the trust instrument was executed. Accordingly, Jerome resigned as a trustee and instituted a non compos mentis proceeding against his mother. This proceeding resulted in the trust’s being set aside and Jerome’s being appointed her guardian. A consent order of the Jefferson Circuit Court directed David to transfer to the guardian 14 houses and 7 promissory notes, to satisfy certain mortgages in his name on other houses, and to transfer certain accounts.
Mrs. Weinberg died on September 6, 1984. When Jerome examined his late mother’s accounts, he discovered a can-celled check on her bank account that reduced that account’s balance to zero. That check had been drawn by Mrs. J.C. Weinberg to the order of David R. Weinberg and was endorsed by David R. Weinberg; these events occurred almost one year after Mrs. Weinberg had been declared incompetent. The facts of this transaction are reported in Weinberg v. Weinberg, 460 So.2d 1350 (Ala.Civ.App.1984); in that case, a jury found that David had converted the amount of that check. Judgment entered thereon was affirmed on appeal.
The contestants also offered the testimony of Dr. James Earl Lee, Mrs. Weinberg’s personal physician from 1956 until she died. Dr. Lee testified to a gradual deterioration in her condition, which deterioration had become noticeable to him in 1977. In his opinion, she experienced an organic brain syndrome, and, as early as June 1977, did not have adequate intelligence and judgment to carry on her business affairs. Dr. Lee’s opinion was bolstered by a report of a hospital examination he ordered from a Dr. Coleman, which report contained a psychological screening. On cross-examination, however, Dr. Lee conceded that it was in April 1979 that he came to his conclusion of Mrs. Weinberg’s condition as of February 1978. Dr. Lee was asked: “It is very difficult today to look at this lady and tell us what her mental condition was two years ago, isn’t it?” He answered, “Yes, sir.”
Dr. Lee related that none of his records of Mrs. Weinberg’s office visits prior to April 1979 indicated any mental incompetency. He added that at the earlier competency hearing he had written a letter to the probate judge stating that Mrs. Weinberg was “incapable of having adequate intelligence and judgment to carry on her business affairs” and that this “has probably *1140 been true for two years or more.” On recross-examination, the following testimony occurred:
“Q. ‘Probably’ is not a very scientific word, is it?
“A. It is based a little bit on science. Most of it is really not at all scientific.
“Q. It is a question that you didn’t want to answer, diagnosing somebody about two years ago and what their situation was, is it?
“A. Yes.”
Dr. Lee’s testimony was followed by that of Jerome Weinberg and Martha Crump, both of whom testified that their mother Was not of sound mind when she executed the second will (the will now in question). Mrs. Crump conceded that she had had no question of her mother’s sound mind when the trust agreement was signed.
With this state of the evidence, we address first the issue of undue influence. Under that claim, the law is well settled, as recited in Nottage v. Jones, 388 So.2d 923, 926 (Ala.1980):
“The general rule is that a presumption of undue influence arises when a person stands in a confidential relation to the testator, dominates the relationship and procures the execution of the will by participation in undue activity. Arrington v. Working Woman’s Home, 368 So.2d 851 (Ala.1979); Pruitt v. Pruitt, 343 So.2d 495 (Ala.1977); Reed v. Shipp, 293 Ala. 632, 308 So.2d 705 (1975). Ordinarily, this presumption does not arise, however, where the testator is the parent and the person active in the procurement of the will is the testator’s child. As we stated in Raney v. Raney, 216 Ala. 30, 112 So. 313 (1927):
“ ‘So, we think it may be said that, ordinarily, the dominance of the will of the parent in will cases will be presumed to continue despite family association or business connection. But when old age weakens the physical and mental powers of the one, and full maturity brings strength to the other, when the parent comes to lean upon the child for counsel, leadership, the conduct of his affairs, the making of a home, it may come to pass, and the law so recognizes, that the natural order may be reversed and the will of the parent pass under the dominant will of the child.
“ ‘The law does not and cannot define the unnumbered conditions that may bring this about. It is an issue of fact for the jury upon evidence giving rise to a just inference. When it does appear that the child has obtained a general dominance over the parent, and has been active in procuring a will giving a favored position over the other children, the presumption of undue influence arises. The burden is then cast upon proponent. All evidence is admissible which tends to show this altered position of the parties in general, or as relates to the making of the will in particular.’ ”
Stated another way, as in Windham v. Pope, 474 So.2d 1075, 1077 (Ala.1985):
“The contestant who alleges undue influence bears the burden of proof. Kelly v. Donaldson, 456 So.2d 30, 33 (Ala.1984). The burden of proof is shifted to the proponent if the contestant proffers evidence (1) that a confidential relationship existed between a favored beneficiary and the testator; (2) that the influence of or for the beneficiary was dominant and controlling in that relationship; and (3) [that there was] undue activity on the part of the dominant party in procuring the execution of the will. Penn v. Jarrett, 447 So.2d 723, 724 (Ala.1984); Reed v. Walters, 396 So.2d 83, 86 (Ala.1981).”
David’s close association and relationship at home with his mother, his controlling administration of her business affairs, the nature of the writings introduced as exhibits, his arrangement for the execution of the will in question, even to the extent of his being billed by the preparing lawyer, nevertheless, at most, presented a jury question on the issue of undue influence. For one thing, the preparing lawyer came to the conclusion after his two interviews with Mrs. Weinberg that she made the will of her own free will. For another, it is not clear that David himself was a favored beneficiary. Jerome Weinberg himself conceded that the division of their *1141 mother’s property was equal among the four devisee children; that the only difference between the former will and the instant contested will was that David was named as executor. If we assume, ar-guendo, that David enjoyed a dominating confidential relationship with his mother, and was engaged in undue activity, even as the testatrix’s child, in procuring the will, his being executor gave him no more claim to the estate than was given others in the same degree of consanguinity. Because David’s execution of the terms of the will is subject to court review by way of accounting or otherwise, it is mere speculation that he was to receive, or could receive, under the will a disproportionate share of the estate as a favored beneficiary. His mere appointment as executor, in itself, did not make him a favored beneficiary. Likewise, we respectfully submit, neither the catalog of his dealings with his mother’s assets during her lifetime, nor his efforts to procure the will, make him a favored beneficiary. That element being absent, the claim of undue influence must necessarily fail.
Additionally, there was evidence on both sides of the mental soundness question. Both the preparing lawyer and the witnessing lawyer testified to their recollection of the execution of the will, and both expressed their opinion that Mrs. Weinberg possessed the requisite mental capacity to execute it. The contestants’ evidence, related herein, was polemic. That dispute presented a jury question, and the jury resolved it in favor of the proponent. Upon the record, we cannot conclude that the judgment entered upon that verdict was clearly wrong and unjust, Nottage v. Jones, supra. It follows that the trial court was not in error in denying the contestants’ post-trial motions.
Let the judgment be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, ALMON and HOUSTON, JJ., concur.